UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                      :
ANGEL L. GUILFUCHI,
                                                      :
                            Plaintiff,                                    OPINION AND ORDER
                                                      :
            -v.-                                                          14 Civ. 8207 (GWG)
                                                      :
COMMISSIONER OF SOCIAL SECURITY,
                                                      :
                            Defendant.
                                                      :
------------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Angel L. Guilfuchi brings this action under 42 U.S.C. § 1383(c) for judicial review of the final decision of the Commissioner of Social Security denying his claim for Supplemental Security Income ("SSI") benefits under the Social Security Act.  Both Guilfuchi and the Commissioner have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  The parties have consented to disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, Guilfuchi's motion is denied and the Commissioner's motion is granted.

I.      BACKGROUND

        A.      Guilfuchi's Claim for Benefits and Procedural History

Guilfuchi applied for SSI benefits on December 29, 2011.  See SSA Administrative Record, filed Mar. 12, 2015 (Docket # 9) ("R."), at 309-19.  He claimed that his ability to work was limited by "Depression/Panic Attacks."  R. 310.  The alleged onset date of his disability was December 15, 2010, R. 142, 160, but Guilfuchi now agrees to treat December 29, 2011 as the alleged onset date for the purposes of this motion, see Pl. Mot. at 1 & n.2.

On April 2, 2012, the Social Security Administration denied Guilfuchi's application.  R. 51-55.  Guilfuchi requested a hearing before an Administrative Law Judge ("ALJ"), R. 64-66, which was held on May 21, 2013, R. 27-47.  On July 26, 2013, ALJ Patrick Kilgannon issued a decision concluding that Guilfuchi was not disabled.  R. 10-19.  Guilfuchi requested review of this decision from the Appeals Council, R. 24, 26, and this request was denied, R. 1-6.  On October 14, 2014, Guilfuchi filed this suit under 42 U.S.C. § 1383(c).  See Complaint, filed Oct. 14, 2014 (Docket # 1).  Both parties have filed motions for judgment on the pleadings.[1]

        B.      The Administrative Record

Guilfuchi and the Commissioner have each provided a summary of the relevant evidence contained in the administrative record.  See Pl. Mot. at 3-11; Comm'r Mem. at 4-12.  The Court adopts the parties' summaries, which do not conflict in any material way, as accurate and complete for purposes of the issues raised in this suit.  We discuss the portions of the administrative record that are pertinent to the adjudication of this case in section III below.

        C.      The Hearing Before the ALJ

The hearing before the ALJ was held on May 21, 2013.  R. 27-47.  Guilfuchi appeared in person and was represented by an attorney.  R. 27, 29.  Guilfuchi testified that his father drove him to the hearing and that that is usually how he gets around.  R. 33.  The ALJ heard testimony from Guilfuchi and vocational expert Jackie Wilson, MS, CRC.  R. 28; see R. 122-24.

Guilfuchi testified first, responding to questions from the ALJ and then his attorney.  He

---

[1]  See Plaintiff's Motion for Judgment on the Pleadings, filed Apr. 3, 2015 (Docket # 11) ("Pl. Mot."); Plaintiff's Memorandum of Law in Support of the Plaintiff's Motion for Judgment on the Pleadings, filed Apr. 3, 2015 (Docket # 12) ("Pl. Mem."); Notice of Motion, filed July 9, 2015 (Docket # 19); Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of Defendant's Cross-Motion for Judgment on the Pleadings, filed July 9, 2015 (Docket # 21) ("Comm'r Mem.").

was 28 years old on the date of the hearing.  R. 33.  He lived with his mother, and he had no

wife, girlfriend, or children.  R. 34.  Guilfuchi had an eleventh-grade education, and he had not

completed a GED or any vocational training.  R. 33.  His current form of income was from

welfare.  R. 33.  As for his work history, Guilfuchi testified that he had done a "maintenance

job" as a "temp" employee for approximately five months, in 2009.  R. 34-35.  His

responsibilities at that job included "cleaning . . . , taking out garbage," and similar tasks.  R. 36.

He left that job because he "just couldn't focus."  R. 40.  "Every time I would get nervous that I

was so far from home, or I [would] get nervous thinking about how I'm going to get home."  Id.

Before that, for approximately two months in 2007, Guilfuchi worked part-time as a cashier and

doing "snapshot photos" at a CVS store.  R. 36.

Guilfuchi reported that his main issues were "anxiety and depression," for which he was

first treated briefly at Bronx Lebanon Clinic, and then at All Med.  R. 36-37.  He went to All

Med for therapy and medication every three months or every month.  R. 37.  Guilfuchi said that

the therapy and medication helped "until [he was] in a situation [where he felt] threatened," at

which point the pills "have no effect."  R. 37-38.  As a result of the medication, Guilfuchi did not

eat as much, and he sometimes experienced dizziness.  R. 41.  Guilfuchi had never been

hospitalized for his condition, and he was not receiving treatment for physical issues.  R. 38.

Guilfuchi indicated that his symptoms had worsened and that he had trouble going out at night.

Id.  His neighborhood was unsafe, but he was financially unable to move.  Id.  When he was later

questioned by his attorney, Guilfuchi elaborated that he experienced anxiety attacks that felt

similar to "when you go down a roller coaster how your stomach turns, your heart beats, my

palms get sweaty, and I just feel like — after three or four days after that, I just feel — like I

don't know what to do anymore."  R. 40.

3

Asked by the ALJ about his daily activities, Guilfuchi responded that he would spend time at his father's house, which was "a couple of blocks" away from his own, watch television, go to appointments, and help his mother with dishes or vacuuming. R. 38-39.  He tried "to think about what [he] can do about [his] condition," including "[f]inancial problems, and things like that." R. 39.  He did not have the concentration to watch movies or read much. R. 39.  He did not socialize with family or friends in person, nor did he talk to them on the phone. R. 39-40.

Next, the ALJ heard testimony from the vocational expert.  The expert classified Guilfuchi's most recent job as a "janitor," which "falls within the medium exertional range, [and] has an SVP of 2, making it unskilled."[2]  R. 43.  She classified his other job as "counter clerk," which "falls within the light exertional range, [and] has an SVP or 2, making it unskilled."  R. 43-44.  The ALJ then asked the expert to assume a hypothetical individual with Guilfuchi's same age, education, and work experience; with "no exertional[,] postural[,] manipulative, environmental visual, or commutative [sic] limitations."  R. 44.  In addition, the ALJ asked the expert to assume that this individual's work "should be limited to unskilled tasks," "in a low stress job . . . having only occasional decision making, requir[ing] only occasional changes in the work setting with no fast paced production or assembly line type work."  Id.  As to social functioning, the ALJ hypothesized that the individual would have "no

---

[2]    The Dictionary of Occupational Titles has been replaced by an online database called the Occupational Information Network or the O*NET.  See Dictionary of Occupational Titles Fourth Edition, Revised 1991, U.S. Dep't of Labor, http://www.oalj.dol.gov/libdot.htm.  The O*NET defines SVP as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  O*NET OnLine Help, https://www.onetonline.org/help/online/svp.  The SVP "levels" correspond to time periods.  For example, Level 8 is a time period of 4 to 10 years whereas Level 2 is "[a]nything beyond short demonstration up to and including 1 month."  Id.

interaction with the public and no more than occasional interaction with coworkers." Id.  Given

those limitations, the expert opined that this hypothetical individual could perform the

occupation of a janitor.  R. 44-45.  The expert further stated that, if such an individual were

absent from work twice a month, he could maintain that employment; but if the individual were

absent three or more days per month, he could not.  R. 45.  Guilfuchi's attorney then asked the

expert to assume that the same hypothetical individual would be off-task for 15 percent of the

work day, and the expert responded that the individual could not perform the job in that case.  R.

45-46.

     D.    The ALJ's Decision

On July 26, 2013, the ALJ issued a decision finding that Guilfuchi was not disabled.

R. 10-19.  After discussing the applicable law, see R. 10-12, the ALJ found that Guilfuchi had

not engaged in substantial gainful activity since December 29, 2011, the alleged onset date of his

disability, R. 12.  The ALJ also found that Guilfuchi had the "severe impairments" of "anxiety

and depression."  Id. (citing 20 C.F.R. § 416.920(c)).  While Guilfuchi had been treated for high

blood pressure, considering that he "had normal physical examinations and did not allege

disability due to physical limitation," the ALJ found that the record did not support any severe

physical ailment.  Id. (citations omitted).  Additionally, the ALJ noted that medication check-up

notes from Francis Dooley, a nurse practitioner, indicated that Guilfuchi was briefly diagnosed

with Attention Deficit Hyperactivity Disorder ("ADHD") not otherwise specified.  Id. (citations

omitted).  However, as Guilfuchi did not appear to have an ongoing diagnosis of ADHD, and it

was not clear what that diagnosis was based on because the record showed no objective testing

confirming it, the ALJ considered the ADHD diagnosis to be unsupported by the record and non-

severe.  Id.

Next, the ALJ found that Guilfuchi did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 13 (citing 20 C.F.R. §§ 416.920(d), 416.925, 416.926). Specifically, Guilfuchi's mental impairments did not "meet or medically equal the criteria of listings 12.04 and 12.06." As to the "'paragraph B' criteria," the ALJ found that the impairments did not cause "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." Id.[3] The ALJ explained that Guilfuchi had only "mild restriction" in his activities of daily living, inasmuch as he was able to wash dishes and clothes, sweep, mop, vacuum, watch television, make beds, shop, cook, handle his personal care needs, and have contact with friends and visits with his father. Id. (citations omitted). As for social functioning, Guilfuchi was found to have "moderate difficulties," because he alleged "severe social phobia" and was "often unable to leave his house." Id. However, the ALJ noted that the record showed Guilfuchi did socialize by having contact with friends, going to visit his father, and living with his mother. Id. (citations omitted). Moreover, he was able to take public transportation and go out alone, and he denied problems with authority figures or ever losing a job due to problems getting along. Id. (citations omitted). As

---

[3] For mental disorders, the "Paragraph B" and "Paragraph C" criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.00(A). Satisfying the "Paragraph B" criteria requires a showing of at least two of the following: "Marked restriction of activities of daily living"; "Marked difficulties in maintaining social functioning"; "Marked difficulties in maintaining concentration, persistence, or pace"; or "Repeated episodes of decompensation, each of extended duration." Id. §§ 12.04(B), 12.06(B). "Marked" is defined as "more than moderate but less than extreme" and may arise "when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." Id. § 12.00(C). Paragraph C requires that a claimant have a "complete inability to function independently outside the areas of one's home." Id. § 12.06(C).

for "concentration, persistence, or pace," the ALJ found that Guilfuchi had only "mild difficulties," because he reads and watches television, "which indicates some ability to focus and follow a story"; shops and cooks meals; keeps track of appointments; can take public transportation alone; pays bills, counts change, is able to handle a savings account and use a checkbook/money order; and denied problems following spoken or written instructions. Id. (citations omitted). Finally, the ALJ stated that Guilfuchi had "experienced no episodes of decompensation, which have been of extended duration." Id. The ALJ concluded that the "parameters of the residual functional capacity," which placed Guilfuchi in "a low stress work environment that is relatively isolated and involves simple tasks," would sufficiently account for his limitations. Id.

As to the "'paragraph C' criteria," the ALJ found that there was "no evidence of any episodes of decompensation, no evidence of a residual disease process predicted to cause decompensation with only minimal increase in mental demands or environmental change, and no evidence of any year or longer stays in a highly supportive living arrangement." R. 14. Additionally, there was "no evidence that [Guilfuchi] is completely unable to function independently outside of [his] home." Id. Therefore, the "'paragraph C' criteria" were not satisfied. Id.

Next, with respect to residual functional capacity, the ALJ found that Guilfuchi could "perform a full range of work at all exertional levels but with the following non-exertional limitations: the work should be limited to unskilled tasks and [Guilfuchi] is limited to work in a low stress job defined as only occasional decision making required and only occasional changes in the work setting with no fast paced production or assembly line work." Id. Also, the ALJ found that Guilfuchi "cannot have any interaction with the public an[d] only occasional contact

7

with co-workers." Id.

The ALJ found that Guilfuchi's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely credible." R. 15; see R. 16. This was because "[t]he record shows relatively infrequent psychiatric treatment." R.15. The ALJ noted that "[d]uring the relevant period, [Guilfuchi] has primarily been followed with monthly medication management appointments," "the record does not show any inpatient hospitalizations," and Guilfuchi "had declined recommendations for therapy." Id. Additionally, "the record shows ongoing marijuana use, which indicates [Guilfuchi] is more active than he admits." Id. (citing examples from treatment notes in the record). The ALJ could not "rule out the potential effects of substance abuse as a catalyst or cause" of Guilfuchi's symptoms with respect to focusing, memory, and mood. Id.

The ALJ went on to summarize relevant evidence in the record. Among other things, the ALJ noted that on August 12, 2010, Guilfuchi was seen at Lincoln Medical Center for anxiety and depression, at which time he "denied suicidal ideation or hallucinations" and indicated that his symptoms began six years earlier when "he and his friends were involved in a slight physical altercation." Id. (citation omitted). Guilfuchi also indicated that he smoked marijuana and drank alcohol occasionally. Id. (citation omitted). Two months before the visit to Lincoln Medical Center, Guilfuchi had quit his job because he "did not feel safe" coming home from work at 2 A.M. Id. Guilfuchi was prescribed Celexa and Risperdal and scheduled for a follow-up visit, but he did not follow up with any additional visits. Id. (citations omitted). The ALJ also noted that Guilfuchi was seen for an evaluation through FEGS on September 28, 2011, and that Guilfuchi had denied a history of alcohol or substance abuse — a denial that was inconsistent with his medical record — and that he was diagnosed with depression and panic attacks. Id. At

8

a follow-up on October 11, 2011, Guilfuchi indicated that he was not taking medication and required no travel accommodations.  R. 15-16 (citation omitted).  On October 20, 2011, notes from a check-up indicated that Guilfuchi spent his day reading or watching television, that his "mental status examination was unremarkable," and that he was "alert, articulate, and well mannered," "well dressed and groomed," with good eye contact, "normal speech," "fair judgment and impulse control," and "no paranoid thinking."  R. 16 (citation omitted).  The ALJ characterized the records of Guilfuchi's treatment with All Med as "subjective" inasmuch as they were "brief and cursory, and usually do not include any mental status examinations or indicate how long [Guilfuchi's] visits were."  Id.  Although Guilfuchi "reported inconsistent responses to medication," he was apparently "followed with relatively infrequent care" in the form of "monthly medication check-ups."  Id.  Summarizing treatment notes from nurse practitioner Francis Dooley, the ALJ noted that on October 24, 2011, Guilfuchi reported that "his mood had lifted on Wellbutrin," and "his fatigue was improving, he was more motivated, and his anxiety was in much better control."  Id. (citation omitted).  The ALJ noted that at a check-up at Bronx Lebanon on November 9, 2011, Guilfuchi "denied being frightened at home or in life," "denied feeling down or depressed," and was diagnosed with "episodic cannabis abuse."  Id. (citations omitted).  Notes from a follow-up visit at All Med indicated that Guilfuchi was referred for therapy, but he refused to talk to a therapist.  Id. (citation omitted); see R. 360.

The ALJ noted that "[r]ecords during the relevant period show that [Guilfuchi] was looking for work," but that he had "only been able to get work from 12-8 P.M. and he felt he was unable to work nights."  R. 17 (citation omitted).  Additionally, on November 19, 2012, Guilfuchi "reported that he had stopped all his medications."  Id. (citation omitted).  Guilfuchi continued to have "brief medication check-ups."  Id.  On May 7, 2013, Guilfuchi reported to

nurse practitioner Dooley that his mood was improving, he was sleeping better, and he had no

medication side effects, but another record from May 22, 2013 showed that he still felt anxious.

Id. (citation omitted).

The ALJ then discussed the opinion evidence in the record and explained what weight he

gave to each opinion.  He assigned "little weight" to the opinion of nurse practitioner Dooley,

who had stated in a disability form that Guilfuchi was "unable to work for at least 12 months as

he was undergoing a medication adjustment."  Id. (citation omitted).  The ALJ found that this

opinion was not well supported, that the opinion did not explain why a medication change meant

Guilfuchi could not work, and that the corresponding treatment note indicated that Guilfuchi was

to be seen only once a month.  Id.  In addition, the ALJ noted that "a nurse practitioner is not an

acceptable medical source" under SSR 06-03p.  Id.

As for the opinions of Dr. Mohamman Shuja of Bronx Lebanon and FEGS medical

director Carole Marks, who had completed similar electronic forms opining on Guilfuchi's

condition, the ALJ assigned these opinions "little weight" because they were "not well supported

or explained," neither doctor appeared to have "any established treatment history" with

Guilfuchi, and it was "unclear what the opinions are based on besides [Guilfuchi's] subjective

allegations."  Id.

The ALJ next addressed the opinion of Dr. Edward Fruitman, who saw Guilfuchi

monthly for medication management.  Id.  On January 10, 2012, Dr. Fruitman reported that

Guilfuchi "was diagnosed with dysthymic disorder, and his GAF score was 60,"[4] but assessed

---

[4] "GAF" stands for Global Assessment of Functioning, a scale last used in the fourth
edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM").  It reports an
individual's "psychological, social, and occupational functioning" and was viewed as
"particularly useful in tracking the clinical progress of individuals in global terms, using a single

that Guilfuchi was "capable of low stress work" and in fact noted that Guilfuchi wanted to work but was "scared of leaving his home because of his neighborhood." Id. The ALJ assigned this opinion "some weight," because it was consistent with the record, which showed that Guilfuchi was looking for work during the relevant period and that Guilfuchi "appears to minimize his functioning" but was nonetheless engaged in various activities. R. 18. The ALJ gave "little weight," however, to Dr. Fruitman's second report dated April 9, 2013. R 17-18. In that report, Dr. Fruitman opined that Guilfuchi still had a GAF score of 60, but assigned Guilfuchi "a number of severe restrictions," which the ALJ found were "not consistent with [the] infrequent care prescribed." R. 17. The ALJ also noted that the report provided no explanation for this inconsistency or the severe restrictions it assessed. R. 18.

The ALJ also assigned "little overall weight" to the March 9, 2012 opinion of consultative examiner David Mahony, Ph.D, that Guilfuchi was mildly limited in certain areas and moderately limited in others due to his anxiety symptoms. R. 18; see R. 380-83. This was because Dr. Mahony did not have access to other record evidence and relied on responses to questions by Guilfuchi that the ALJ believed to reflect malingering. R. 18. For example, Guilfuchi "allegedly could not even perform simple calculations," even though he had completed eleventh grade, worked for a time as a cashier, and previously reported being able to manage money and shop in stores. Id. Additionally, although the result of Dr. Mahony's examination was that Guilfuchi's cognitive functioning was "borderline," the ALJ noted that Guilfuchi's

---

measure." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). A GAF score of 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)"; or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34. The latest edition of the DSM, the fifth edition, no longer includes GAF scores. See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

"primary care provider reported he had no cognitive limitations."  R. 16 (citation omitted).

Finally, the ALJ assigned "limited weight" to the March 23, 2012 opinion of psychologist and

state agency evaluator T. Harding, Ph.D, which stated that Guilfuchi had "a range of no

significant limitations to moderate limitations."  R. 18; see R. 49.  The ALJ noted that Dr.

Harding was unable to review newer record evidence and did not provide a clear medical source

statement.  R. 18.

Thus, the ALJ concluded that his residual functional capacity assessment of Guilfuchi

was supported by the medical evidence in the record, the opinions of state agency doctors, and

Guilfuchi's treatment history.  R. 19.

As to Guilfuchi's ability to perform his past relevant work as a janitor, the ALJ found

that Guilfuchi most recently worked as a janitor in 2009 for approximately five months.  Id.  He

further noted that the vocational expert had testified that, based on the above-discussed residual

functional capacity, Guilfuchi was capable of performing that past relevant work.  Id.

Accordingly, the ALJ concluded that Guilfuchi "has not been under a disability, as defined in the

Social Security Act," as of the date of his application for SSI.

II.     APPLICABLE LAW

        A.      Scope of Judicial Review Under 42 U.S.C. § 1383(c)

A court reviewing a final decision by the Commissioner "is limited to determining

whether the [Commissioner's] conclusions were supported by substantial evidence in the record

and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)

(per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117,

127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . "); id.

§ 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) . . . ."). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

    "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)); see McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the "substantial evidence" standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation omitted). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 448 (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore 'quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (quoting Hernandez v.

Barnhart, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007)).

  B.  <u>Standard Governing Evaluation of Disability Claims by the Agency</u>

  The Social Security Act defines the term "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  A person will be found to be disabled only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." <u>Id.</u> § 1382c(a)(3)(B).

  To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

  Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. <u>See</u> 20 C.F.R. §§ 404.1, 404.1520(a)(4); <u>see also</u> <u>Burgess</u>, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," <u>id.</u> § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or

mental ability to do basic work activities," id. § 404.1520(c).  Third, if the claimant's

impairment "meets or equals" the severity of one of the listings in 20 C.F.R. Part 404, Subpart P,

Appendix 1, and "meets the duration requirement," the claimant must be found disabled.  Id.

§ 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment does not meet or equal one of the

listed impairments, or does not meet the duration requirement, the Commissioner must review

the claimant's residual functional capacity to determine if the claimant is able to do the work he

has done in the past, i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able

to do such work, he is not disabled.  Id.  Finally, if the claimant is unable to perform past

relevant work, the Commissioner must decide if the claimant's residual functional capacity, in

addition to his age, education, and work experience, permit the claimant to do other work.  Id.

§ 404.1520(a)(4)(v).  If the claimant cannot perform other work, he will be deemed disabled.  Id.

The claimant bears the burden of proof on all of these steps except the final one — that is,

proving that there is other work the claimant can perform.  See Cichocki v. Astrue, 729 F.3d 172,

176 (2d Cir. 2013) (per curiam) (quoting Burgess, 537 F.3d at 128).

III.    DISCUSSION

Guilfuchi argues (1) that the ALJ failed to give adequate weight to the opinions of Dr.

Fruitman, his treating psychiatrist, see Pl. Mem. at 1-10; and (2) that he ALJ did not properly

evaluate the side effects of his medication, see Pl. Mem. At 11.  We discuss each issue in turn.

A.    The Treating Physician Rule

Guilfuchi contends that the ALJ's decision does not give proper weight to the opinions of

Dr. Fruitman.  See Pl. Mem. at 1-10.  In Guilfuchi's view, both of Dr. Fruitman's psychiatric

assessments, completed January 10, 2012 and April 9, 2013, respectively, support a finding that

Guilfuchi was disabled.  See id. at 3-6.

15

In determining whether a claimant is disabled, a treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2).  Under this rule, the Commissioner is not required to give deference to the treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (citation omitted). Moreover, "the less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)).  "Genuine conflicts in the medical evidence are for the Commissioner to resolve."  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citation omitted).

Where an ALJ does not give controlling weight to the opinion of a treating physician, he must consider other factors in determining what weight to give the available opinions.  20 C.F.R. § 416.927(c)(2); accord Halloran, 362 F.3d at 32.  These factors include: (1) the "[l]ength of the treatment relationship and the frequency of examination," (2) the "[n]ature and extent of the treatment relationship," (3) the evidence and explanations supporting an opinion, (4) the consistency of the opinion with the record as a whole, and (5) whether the person offering the opinion is a specialist in the area at issue.  20 C.F.R. § 416.927(c)(2)(i)-(ii), (c)(3)-(6). Additionally, the ALJ must provide "good reasons" for not affording the treating physician's opinion controlling weight.  E.g., Halloran, 362 F.3d at 32 (citations omitted); accord 20 C.F.R. § 416.927(c)(2).

Here, the ALJ did not specifically identify the treating physician rule by name, but it is clear that he did not afford Dr. Fruitman's opinion controlling weight.  Rather, the ALJ assigned

16

"some weight" to Dr. Fruitman's first opinion that Guilfuchi was "capable of low stress work," and "little weight" to Dr. Fruitman's second opinion assessing "a number of severe restrictions" for Guilfuchi.  R. 17-18.

We find that the ALJ adequately explained his failure to give Dr. Fruitman's opinion controlling weight.  The ALJ noted that Dr. Fruitman's two opinions were inconsistent, that no explanation was provided for the increased severity of restrictions in the second opinion, and that the treatment record did not show any change in Guilfuchi's condition.  See id.  The ALJ explained that Dr. Fruitman's first opinion was consistent with record evidence indicating that Guilfuchi was actively searching for work during the period of alleged disability.  R. 18; see R. 430 (treatment note from Dr. Fruitman dated January 11, 2012, indicating that Guilfuchi had "attempted to work but didn't like working late," though he "wants to" work); R. 414 (treatment note from nurse practitioner Dooley indicating that Guilfuchi was looking for work). Additionally, the ALJ mentioned Guilfuchi's "busy activities" as evidenced in the record, which he considered consistent with Dr. Fruitman's first opinion of Guilfuchi's ability to work.  R. 18; see R. 321-28 (function report completed at the time of Guilfuchi's SSI application indicating that he prepared "light meals" for himself two to three times per week; left the house to attend appointments three to five times per week using public transportation; was able to shop in stores, pay bills, count change, handle a savings account, and use a checkbook or money orders); R. 170-80 (function report signed by Guilfuchi on February 26, 2012, indicating that he read, watched television, tried to listen to music or play a game to keep his mind occupied, sometimes made himself a sandwich, washed his clothes by hand, cleaned his room, and spent time with his father and stepmother); R. 38-39 (Guilfuchi's hearing testimony that he goes to his father's house, watches television, and helps his mother do chores such as dishes or vacuuming).  As to

17

Dr. Fruitman's second opinion, the ALJ explained that he considered this to be of "little weight" because the doctor had not explained why he assigned more severe restrictions, particularly when Guilfuchi's GAF score of 60 remained the same and there was no change in treatment or Guilfuchi's reported activities in the time between the two assessments.  See R. 17-18.  The ALJ also explained that these severe restrictions were not consistent with the infrequent care prescribed (in the form of monthly medication check-ups only), or with Guilfuchi's daily activities.  Id.   The ALJ thus did not reject Dr. Fruitman's explanation without explanation but gave logical reasons for doing so.

Guilfuchi claims that Dr. Fruitman's opinions were supported by other expert opinions from nurse practitioner Dooley, Dr. Mahony, and Dr. Harding, as well as contemporaneous treatment notes.  See Pl. Mem. at 6-8.  With respect to nurse practitioner Dooley, who provided an opinion in a Treating Physician's Wellness Plan Report dated December 2, 2011, R. 293-94, the ALJ correctly noted that "a nurse practitioner is not an acceptable medical source" under the relevant regulations, R. 17; see 20 C.F.R. § 416.913(d) (categorizing nurse practitioners as "[o]ther sources" than acceptable medical sources).  Guilfuchi counters that it may be appropriate to give more weight to the opinion of one who is not an acceptable medical source if he saw the claimant more often than the treating source and provided better evidence and explanation for his opinion.  See Pl. Mem. 6 n.1 (citing Policy Interpretation Ruling: Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, SSR 06–03p, 2006 WL 2329939, at *5 (Aug. 9, 2006)).  But it is clear that the ALJ did not decide to afford "little weight" to nurse practitioner Dooley's opinion solely because the nurse practitioner was not an "acceptable medical source"

18

— the ALJ also explained that Dooley's opinion was not well supported and lacked an

explanation of why Guilfuchi would not be able to work while undergoing a medication change.

R. 17.

Dr. Mahony completed a psychiatric evaluation of Guilfuchi on March 9, 2012.  R. 380-

83.  The ALJ accorded this opinion "little overall weight," opining that Guilfuchi was

malingering during this assessment, because Guilfuchi apparently made statements that were

inconsistent with other record evidence, particularly with regard to his drug use and ability to do

simple calculations.  R. 16, 18; compare R. 380 (Guilfuchi denied drug and alcohol history to Dr.

Mahony) and R. 381 (Dr. Mahony reported Guilfuchi was "unable to do simple calculations or

serial 3s correctly") with R. 364-65, 404-05, 408-09, 442 (treatment notes ranging from 2011 to

2013 indicating Guilfuchi used marijuana) and R. 155 (function report indicating Guilfuchi was

able to pay bills and count change) and R. 36 (Guilfuchi's hearing testimony that he worked for a

time as a cashier).  Moreover, the ALJ noted that Dr. Mahony "was not privy to the other

evidence of record in conducting the examination."  R. 18.  Aside from these points, we note that

Dr. Mahony ultimately concluded that Guilfuchi could "follow and understand simple directions

and instructions" and "perform simple tasks independently"; that he would have only mild or

moderate difficulties "maintaining attention and concentration and maintaining a regular

schedule"; "learning new tasks, performing complex tasks, [and] making appropriate decisions";

with severe difficulties only in "relating adequately with others and dealing with stress."  R. 382.

Thus, Dr. Mahony's opinion is consistent in many respects with the ALJ's findings.

As for Dr. Harding, the ALJ explained that he assigned Dr. Harding's opinion, provided

in a Psychiatric Review Technique dated March 23, 2012, R. 384-401, "limited weight" because

Dr. Harding was "not able to review the newer evidence of record and does not provide a clear

19

medical source statement," R. 18.  Notably, Dr. Harding's assessment does not even provide

substantial evidence to support Guilfuchi's position because he found only "mild," not

"marked," restrictions in Guilfuchi's activities of daily living.  R. 394.  He found only

"moderate" difficulties in maintaining social functioning, concentration, persistence, or pace;

and no repeated episodes of deterioration, each of extended duration.  Id.  Additionally, Dr.

Harding found no significant limitations with respect to Guilfuchi's abilities to remember

locations and work-like procedures; understand, remember, and carry out very short and simple

instructions; perform activities within a schedule, maintain regular attendance, and be punctual

within customary tolerances; maintain an ordinary routine without special supervision; make

simple work-related decisions; complete a normal workday and workweek without interruptions

from psychological symptoms and to perform at a consistent pace without an unreasonable

number of rest periods; ask simple questions or request assistance; maintain socially appropriate

behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to

changes in the work setting; be aware of normal hazards and take normal precautions; and set

realistic goals or make plans independently of others.  R. 398-99.

Finally, Guilfuchi contends that Dr. Fruitman's opinions were supported by Guilfuchi's

contemporaneous medical records.  See Pl. Mem. at 8.  Guilfuchi points to several instances in

the record where treatment notes indicate that his anxiety and/or depression were ongoing.  See

id. (citing R. 353, 355, 357, 403, 414, 417, 427, 430).  But in many instances, the treatment notes

indicate that Guilfuchi's symptoms were sometimes abated, particularly with changes in

medication.  See, e.g., R. 351 (treatment note dated November 2, 2011 indicating that

Guilfuchi's "mood has improved on Welbutrin" and his "anxiety [was] in much better control on

Klonopin"); R. 431 (treatment note dated January 3, 2012 indicating that, although Guilfuchi's

anxiety persisted, his mood was euthymic and he was "in fairly good spirits"); R. 420 (treatment note dated June 13, 2012 indicating that Guilfuchi's mood was euthymic and his anxiety was "in control"); R. 419 (treatment note dated July 13, 2012 indicating that Guilfuchi's anxiety was "in good control").

In sum, while there is evidence in the experts' opinions and treatment notes to support Guilfuchi's position, there is also substantial evidence supporting the ALJ's decision.  Moreover, the ALJ adequately explained why he weighed each opinion as he did in making that decision. We therefore cannot find that the ALJ erred in his assessment of the opinion evidence.

    B.    <u>The Side Effects of Guilfuchi's Medications and the ALJ's Duty to Develop the Record</u>

Guilfuchi briefly argues that the ALJ failed to adequately consider the side effects of his medications.  See Pl. Mem. at 11.  As he points out, see id., in determining whether a claimant is disabled, the ALJ is required to consider, in addition to objective medical evidence, factors relating to a claimant's symptoms, including "[t]he type, dosage, effectiveness, and side effects of any medication" the claimant takes to alleviate pain or other symptoms, 20 C.F.R. § 416.929(c)(3)(iv).  While the Commissioner's memorandum of law inexplicably ignores Guilfuchi's argument on this point, this does not warrant remand.

In response to a question from his attorney, Guilfuchi testified that his medications "sometimes" make him dizzy, and cause him to eat less.  R. 40-41.  And an April 22, 2013 treatment note from Dr. Jose Rodriguez at All Med reported that Guilfuchi complained of "dizziness on and off."  R. 404-05.  But it appears these are the only points in the 446-page record in this case where there is any suggestion that Guilfuchi experiences any side effects from his medication.  And neither of these pieces of evidence suggests that this symptom has any

effect on Guilfuchi's fuctioning.  Moreover, there were far more treatment notes indicating that Guilfuchi experienced no dizziness — or any side effects at all — from his medications.  See R. 403 (May 7, 2013 treatment note from nurse practitioner Dooley indicating that Guilfuchi was not experiencing side effects from his medication); R. 409 (April 12, 2013 treatment note from Dr. Rodriguez reporting that Guilfuchi was negative for dizziness); R. 434 (Dr. Fruitman's second evaluation of April 9, 2013, listing no side effects from Guilfuchi's medications); R. 413 (January 22, 2013 treatment note from nurse practitioner Dooley reporting no side effects from Klonopin, Wellbutrin, or Seroquel); R. 422 (April 30, 2012 treatment note from a medication management visit reporting no side effects from medication); R. 374 (January 10, 2012 report of Dr. Fruitman listing no side effects for medications); R. 365 (treatment note from October 12, 2011, reflecting that Guilfuchi was "[n]egative for dizziness"); R. 186 (Disability Report stating that there were no side effects from any of the four medications Guilfuchi was taking).

In his decision, the ALJ noted that Guilfuchi "reported inconsistent responses to medication," R. 16, and that one treatment note indicated Guilfuchi "had no medication side effects," R. 17.  It is thus clear that the ALJ considered the question of side effects, and thus that it formed part of his evaluation of Guilfuchi's credibility and residual functional capacity.  Given that there was no medical evidence that the side effects of Guilfuchi's medication affected his residual functional capacity, it was not necessary for the ALJ to discuss the issue further.  See, e.g., Brault, 683 F.3d at 448 ("[a]n ALJ does not have to state on the record every reason justifying a decision," nor is an ALJ "required to discuss every piece of evidence submitted") (citation and internal quotation marks omitted); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (citation omitted).

IV.    <u>CONCLUSION</u>

For the reasons explained above, Guilfuchi's motion for judgment on the pleadings

(Docket # 11) is denied and the Commissioner's motion (Docket # 19) is granted.

SO ORDERED.

Dated: January 12, 2016
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

23